**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT
A.S. (MOTHER):

**GREGG S. THEOBALD**
Lafayette, Indiana


ATTORNEY FOR APPELLANTS
D.F. (FATHER) and J.S. (FATHER):

**MICHAEL B. TROEMEL**
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana


**CRAIG JONES**
DCS Tippecanoe County Office
Lafayette, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF J.L.S., N.S., and M.S. (Minor Children), and A.S. (Mother), D.F. (Father), and J.S. (Father), | ) ) ) ) ) | |
| Appellants, | ) ) | |
| vs. | ) ) | No. 79A02-1111-JT-1123 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) ) | |
| Appellee. | ) ) | |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Loretta H. Rush, Judge

**June 18, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**DARDEN, Judge**

STATEMENT OF THE CASE

The following parties appeal the involuntary termination of their parental rights: (1) A.S. ("Mother") appeals the involuntary termination of her parental rights to J.L.S, M.S., and N.S.; (2) D.F. ("Father D.F.") appeals the involuntary termination of his parental rights to J.L.S; and (3) J.S. ("Father J.S.") appeals the involuntary termination of his parental rights to M.S. and N.S.

We affirm.

ISSUES

1. Whether there is clear and convincing evidence to support the involuntary termination of Mother's parental rights to J.L.S., N.S., and M.S.

2. Whether there is clear and convincing evidence to support the involuntary termination of Father D.F.'s parental rights to J.L.S.

3. Whether there is clear and convincing evidence to support the involuntary termination of Father J.S.'s parental rights to M.S. and N.S.

FACTS

J.L.S. was born to Mother and Father D.F. on September 4, 2007. M.S. was born to Mother and Father J.S. on December 29, 2008, and N.S. was born to Mother and Father J.S. on June 12, 2010. At the time of the 2011 termination hearing, Mother was twenty-one years of age; Father D.F. was twenty-nine years of age; and Father J.S. was thirty-three years of age. (Mother's App. 29).

All three children lived with Mother when the Tippecanoe County Department of Child Services ("DCS") filed an August 4, 2010 CHINS petition on the basis that Mother (1) was unable to meet the children's basic needs such as housing, formula, and diapers; (2) was not taking her mental health medications for ADHD and her bi-polar disorder; and (3) had not ensured that N.S. was receiving timely immunizations. In addition, DCS alleged that M.S. tested positive for marijuana, and Mother admitted using marijuana while M.S. was in utero. The children remained in Mother's care, and Mother and both Fathers agreed to participate in a number of interim services, including drug and alcohol assessments and random drug screens.

In September 2010, Mother, M.S., and N.S. tested positive for methamphetamine. The children were placed in a foster home after a detention hearing on the following bases: Mother had left N.S. home alone; Mother did not follow an agreed upon safety plan; Mother tested positive for methamphetamine; Mother claimed that Father D.F. was smoking methamphetamine; Mother had not sought treatment for her cannabis

dependence, bi-polar disorder, and ADHD; and Father D.F. admitted that his drug screen would come back positive for methamphetamines, Klonopin, and marijuana.

On September 27, 2010, the trial court held a fact finding hearing and found the children to be children in need of services ("CHINS"). The majority of the trial court's findings were materially similar to its findings in its detention order. The trial court also found that Father J.S. "does not have regular contact with his child and has failed to appear at the last two hearings in this matter. [Father J.S.] has a history of violence, repeated incarceration, and drug use." (DCS Ex. 1, at 28). The trial court found that all interim orders were to remain in effect and that Mother was to participate in a sex education class.

On December 13, 2010, the trial court conducted a show cause hearing and found Mother and Father D.F. in contempt for their failure to participate in services. On January 24, 2011, the trial court conducted a periodic review hearing and ordered Mother to continue services as previously ordered. The trial court allowed Father D.F. to participate in future hearings by telephone, as he was incarcerated.

On February 14, 2011, the trial court found that Mother had tested positive for cannabinoids on January 21, 2011. On July 13, 2011, the trial court approved a permanency plan of termination of parental rights. On October 19, 2011, after a termination hearing, the trial court entered findings of fact and conclusions of law in support of its determination that Mother's parental rights should be terminated as to J.L.S., N.S., and M.S; that Father D.F.'s parental rights should be terminated as to J.L.S.; and that

4

Father J.S.'s parental rights should be terminated as to M.S. and N.S. The trial court determined that there was no reasonable possibility that the reasons for continued placement outside the home would be remedied and that the continuation of the parent-child relationship posed a threat to the children's well being. The trial court also determined that termination was in the children's best interests. Additional facts are discussed below.

DECISION

The traditional right of parents to establish a home and raise their child is protected by the Fourteenth Amendment to the United States Constitution. *Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). Parental rights may be terminated when parents are unable or unwilling to meet their parental responsibilities. *Id.* The purpose of terminating parental rights is not to punish a parent but to protect the child. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*, *cert. denied*.

When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Bester*, 839 N.E.2d at 147. We will only consider the evidence and reasonable inferences therefrom that are most favorable to the judgment. *Id.* When reviewing findings of fact and conclusions thereon entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. *Id.* First, we determine whether the evidence supports the findings. *Id.* Then, we determine whether the findings support the judgment. *Id.* The trial court's judgment will be set

5

aside only if it is clearly erroneous. *Id.* "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *Id.* (quoting *In re R.J.*, 829 N.E.2d 1032, 1034 (Ind. Ct. App. 2005)).

When DCS seeks to terminate parental rights pursuant to Indiana Code section 31-35-2-4(b)(2), it must plead and prove in relevant part:

> (B) that one (1) of the following is true:
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied;
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child;
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services.
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.[1]

These allegations must be established by clear and convincing evidence. *In re I.A.*, 934 N.E.2d 1127, 1133 (Ind. 2010).

Because subsection (b)(2)(B) is written in the disjunctive, DCS need prove only one of the elements by clear and convincing evidence. *See I.A.*, 934 N.E.2d at 1133. Thus, if we hold that the evidence sufficiently shows that there is reasonable probability that the conditions resulting in removal or the reasons for placement outside the home of the parents will not be remedied, we need not address whether the continuation of the

---

[1] Neither Mother nor the fathers contend that DCS presented insufficient evidence that there is a satisfactory plan for care and treatment of the children.

6

parent-child relationship poses a threat to the well-being of the child. *See* I.C. § 31-35-2-4(b)(2)(B); *In re A.N.J.*, 690 N.E.2d 716, 721 n.2. (Ind. Ct. App. 1997).

1.      Termination of Mother's Rights

    *a.*      *Conditions Remedied*

Mother contends that the trial court erred in concluding that the conditions that resulted in the children's removal and continued placement outside Mother's home would not be remedied. For the most part, Mother cites her own self-serving testimony from the termination hearing in support of her contention, while occasionally citing testimony by others that is qualified by other testimony. In essence, Mother is asking us to reweigh the evidence in her favor.

The trial court should judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. "However, a parent's habitual patterns of conduct must also be considered to determine whether there is a substantial probability of future neglect or deprivation." *Id.* "[A] trial court does not need to wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship." *Castro v. Ind. Office of Family & Children*, 842 N.E.2d 367, 372 (Ind. Ct. App. 2006), *trans. denied*. When the evidence shows that the emotional and physical development of a child is threatened, termination of parental rights is appropriate. *Id.*

The trial court may consider a parent's history of neglect, failure to provide support, lack of adequate housing and lack of employment, among other things. *McBride v. Monroe Cnty. Office of Family and Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). DCS is not required to rule out all possibilities of change; rather it need establish "only that there is a reasonable probability that the parent's behavior will not change." *In re Kay.L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

Mother contends that the trial court's findings that she had "a long history of unstable and unhealthy relationships" and that she "was involved in numerous relationships during the pending CHINS" are not supported by the evidence. Mother's Br. at 19. We agree that the evidence does not support the latter finding, but Mother's involvement with both fathers illustrates her history of unstable relationships with men who use illegal drugs, spend time in prison or jail, and are unable to consistently provide for the children.

Mother also contends that the trial court's finding that she "has not been able to maintain her mental health during the CHINS case" is not supported by the evidence. Mother's Br. at 19. Mother stresses evidence that she engaged in mental health counseling and that interruptions in her counseling were not caused by her actions. This contention is true as it applies to evidence of Mother's attendance at counseling; however, it ignores the crux of the trial court's finding, which is that "Mother was ordered to do medication management in the CHINS case to help her with her mental health diagnosis. Mother has not complied. Mother has refused to take her medication." (Appellants' App.

8

4). Mother admitted at the termination hearing that she has not received the valuable assistance of medication management to help her control her mental health problems.

Mother further contends that the evidence does not support the trial court's finding of her "lack of safe parenting skills even after extensive parent training." Mother's Br. at 20. She emphasizes evidence that she loves her children, that she obtained parenting training, and that one parenting trainer, Paul Stamm, testified that she can care for her children by herself. While no witness doubted Mother's love for her children, there is much contrary evidence which shows that she is not ready to take care of them. For example, the CASA representative emphasized that even after a long CHINS procedure, Mother is still incapable of handling anything but fully supervised visits with the children. The CASA also testified that Mother is incapable of paying attention to her children's needs and that after a supervised visitation Mother told her, "I can't do it; I can't control [the children]." (Tr. 281). Although Stamm felt that Mother could care for the children during supervised visitation, he made no assessment of her ability to care for them outside the boundaries of supervision. There is sufficient evidence to support the trial court's finding that Mother cannot ensure the safety of the children if they are put into her unsupervised care.

Mother additionally argues that the trial court erred in finding that Mother was "not consistent in parenting time and family preservation . . . ." Mother's Br. at 21. In support of her argument, she cites the consistency of her attendance at supervised visitations and

9

the testimony of Claire Eberle, a family preservation worker who supervised some of the visitations, and of Stamm, who also supervised visitations.

While both Eberle and Stamm acknowledged the consistency of Mother's attendance at visitations, they also testified as to their concerns pertaining to Mother's ability to safely parent the three children without supervision. Eberle testified that when supervised visitations occurred in a community setting, "[i]t seems to be a little overwhelming for [Mother] to have the care of all three children on her own . . . other adults [would] come to the visits, [Mother] would watch them interact with her children . . . instead of being engaged with them." (Tr. 112). Eberle also testified that '[t]here were several times [during community visitations] that the baby was left alone without supervision." (Tr. 112). Eberle further testified that Mother had a recurring problem with inattentiveness during visitations.

Stamm testified that he would be concerned for the children's safety if Mother became the permanent caretaker. He stated the following concerns:

> The concerns would be the inconsistency; delayed response in responding to the children when they are supervised; the interaction she has sometimes which appears to be sharp or angry with the children. That requires an intervention and I do intervene immediately when it happens. I would be concerned if someone was not present to intervene. And just the distractability that she has during the visits sometimes I would be concerned . . . Concern for safety that she might not be aware of safety concerns around her children; concern that she might not be aware of what the children are doing, she might be distracted by something, a phone or a friend or something else and not pay attention to the whereabouts of the children or what's in their mouth or what they're doing, those kinds of concerns.

10

As the children become older they'll become more defiant and she will perceive that as a personal attack on herself. And so that's a concern of mine.

(Mother's App. 54-55).

Finally, Mother contends that the trial court erred by finding that "Mother has not been able to maintain independent housing during the CHINS case. Mother's family home was crowded with many adults with drug, criminal, and abuse and neglect history." (Mother's App. 23). Mother observes that DCS neglected to conduct a home study after Mother allegedly cleared her home of these adults.

The trial court acknowledged that Mother testified at the termination hearing that "her family is going to move out of the family home to make it available for the children." (Mother's App. 23). It is clear that the trial court considered Mother's pattern of conduct and determined that any clearing of the house would only be temporary. We will not reassess the evidence.

In short, the evidence presented at the termination hearing was sufficient to show that Mother was not capable of supervising her children or controlling her mental health problems. There is evidence to support the trial court's ultimate finding that the conditions that necessitated the continued placement outside the home would not be remedied.

### b.    Best Interests

Mother contends that DCS failed to establish that termination of the relationship with Mother was in the children's best interests. Mother notes that she loves the children

and wants to provide a loving environment for them. Mother argues that ending a loving relationship between her and the children would not be in their best interests.

With regard to the "best interests of the child" statutory element, the trial court is required to consider the totality of the evidence and determine whether the custody by the parent is wholly inadequate for the child's future physical, mental, and social growth. *In re A.K.*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010), *trans. dismissed*. In making this determination, the trial court must subordinate the interest of the parent to that of the child involved. *Id.* The recommendations of the CASA and the child's caseworker that parental rights be terminated support a finding that termination is in the child's best interests. *See A.J. v. Marion County Office of Family and Children*, 881 N.E.2d 706, 718 (Ind. Ct. App. 2008), *trans. denied*.

The CASA representative for all three children testified that termination was in the best interests of the children because of Mother's "lack of stability" and noted that "we're still at fully supervised visits that are in a therapeutic setting for eight hours a week; the kids have been back and forth." (Tr. 277-78). The CASA representative also testified that "these kids have been yanked around and they're confused and their behaviors are upsetting when they get back to the foster home; and they don't know if they're coming or going . . . I don't think [Mother] has the ability to meet the needs of all three children at one time." (Tr. 279-80). The case manager for DCS, Penny Spray, concurred with the CASA representative that termination was in the children's best interests.

These termination recommendations, coupled with evidence that the conditions that occasioned the removal and continued placement of the children outside the home, are sufficient to support the trial court's conclusion that termination of Mother's parental rights is in the best interests of the children.

2.      Termination of Father D.F.'s Rights

        a.      *Conditions remedied*

Father D.F. contends that the trial court erred in concluding that the conditions that resulted in the children's removal and continued placement outside his custody will not be remedied. He points to evidence that he was released from incarceration on the morning of the termination hearing. He further points to his testimony that had secured a "place to stay" at a friend's house and was "about to apply for disability payments due to his learning disability." Father D.F.'s Br. at 18. In support of his contention, Father D.F. cites *In re J.M.*, 908 N.E.2d 191 (Ind. 2009), wherein our supreme court found the State did not prove, among other things, the conditions that resulted in the child's removal would not be remedied.

In *J.M.*, the parents had an "ongoing relationship with [the child] during the first three years of his life and there were no allegations that during this period of time they were unfit parents in any way." *Id*. at 192. Additionally, both Mother and Father had taken steps to provide permanency for their child upon their release from prison—Father had a job waiting for him and had also secured a home where the family could live, and Mother was on track to complete her college degree. *Id*. at 194-95. Our supreme court

13

held that the evidence supported the conclusion that the incarcerated parents' ability to establish a stable and appropriate home for the child could be determined within a relatively short time after their release, which was imminent. *Id*. at 196.

Here, although Father D.F. had spent time with J.L.S. when she was small, he violated probation on a drug charge and was incarcerated during the CHINS action. Indeed, it was he who smoked methamphetamine with Mother in the early part of the case, causing two of the children to test positive for methamphetamine. Father D.F. has been incarcerated many times, and each time he temporarily kicked his drug habit. He maintained no contact with J.L.S. during incarceration. Even though Father D.F. has taken some positive steps toward getting past his drug condition and his penchant for breaking the law because of illegal drugs, the trial court did not find that his steps constituted sufficient evidence of a change to remedy the conditions which has put J.L.S. in foster care. We will not reassess or reweigh the evidence.

### b. Best interests

Father D.F. next contends that termination is not in the best interests of the children. In support of his contention, he cites *In re G.Y.*, 904 N.E.2d 1257 (Ind. 2009).

In *G.Y.*, the incarcerated mother challenged the juvenile court's finding that termination was in the child's best interests based on the child's need for consistency and permanency provided by the pre-adoptive foster home in which the child had resided for two years. 904 N.E.2d at 1261. In reversing the juvenile court's termination order, our supreme court considered the child's general need for permanency and stability and

concluded that, where the mother's release from prison was imminent and she had made remarkable efforts toward reunification, the evidence was insufficient to show that the child would be harmed by remaining a foster care ward until he could be reunited with his mother. *Id*. at 1265. In sum, the court in *G.Y.* dispelled the notion that DCS workers and/or CASA representatives can use the terms "need for permanency" and/or "need for stability" as incantations instead of presenting evidence that directly corresponds to the best interests of the child(ren).

There are substantial differences between the facts in *G.Y.* and those in this case. Although Father D.F. is out of prison and has been accepted into the Seeds of Hope live-in recovery program, he has shown no past ability to overcome the drug use and related crimes that have kept him in trouble with the law. In fact, before being arrested for his parole violation of possessing methamphetamine and being returned to incarceration during the CHINS action, he had already begun to become inconsistent in the drug treatment program in which he was enrolled. Father D.F. also has another child who he has not supported or seen in years, and he testified that he is planning to marry a woman who has had her parental rights terminated on seven children. He has no plan for the care of J.L.S., and he has no place for her to live if she were to be placed with him. In short, there is no evidence to establish that Father D.F., like the mother in *G.Y.*, will be able to provide stability or permanency within a reasonable time. Meanwhile, J.L.S., who was four years old at the time of the termination hearing, is waiting with pre-adoptive foster parents for a father she does not know to somehow become a stable parent for her. Under

15

these circumstances, we cannot say that the trial court erred in determining that termination was in J.L.S.'s best interests.

3.     Termination of Father J.S.'s Parent Rights

*a. Conditions remedied*

Father J.S. contends that the trial court erred in concluding that the conditions that resulted in M.S.'s and N.S.'s removal and continued placement outside his custody will not be remedied.  Like Father D.F., Father J.S. cites *In re J.M.* in support of his contention.

During the CHINS case, Father J.S., who was subject to arrest charges, absconded from Indiana and hid in Florida, thinking that Mother could bring the children down to Florida to live with him.  Father J.S. believed that he could not be extradited from Florida, but he eventually returned to Indiana and was incarcerated.  Father J.S. has been incarcerated "pretty much . . . . the better part of the last 11 years." (Tr. 169).  Father J.S. maintains that he is now capable of changing his behavior and providing a stable home for the children.

The trial court found the following regarding the termination of Father J.S.'s parental rights:

> [Father J.S.] has been involved in five (5) different CHINS proceedings involving his children with three different women.  He is currently incarcerated and should be eligible for a community transition program in forty-three (43) days.  [Father J.S.] has been incarcerated this last time since May 12, 2011.  [Father J.S.] has been living in Florida because of outstanding criminal warrants since November 2010.  He is currently involved in two (2) open CHINS cases in Tippecanoe County.

16

[Father J.S.] has other children who were found to be CHINS in Tippecanoe County on three (3) separate occasions . . . [Father J.S.] only appeared for three (3) hearings in this matter and did not complete court ordered services. Writs for his arrest were issued . . . for failing to appear. [Father J.S.] failed to participate in services in this CHINS . . . .

[Father J.S.'s] children were found to be children in need of services in [other cases] due to physical abuse and lack of suitable housing . . . .

[Father J.S.'s] children were found to be children in need of services in [still other cases] . . . . [Father J.S.] could not provide for his children due to his incarceration and due to the protective order in place for him and the children. [Father J.S.] failed to participate in services in this case and failed to attend hearings . . . .

[Father J.S.'s] parental rights were terminated for a son in a fourth CHINS proceeding in White County in 2010. Father J.S. had only had one visit with this child.

[Father J.S.] had not provided any financial support for N.S. or M.S. or his other children during the CHINS case. [Father J.S.] had provided Mother with transportation and in kind support prior to the DCS getting involved in the case.

[Father J.S.'s] criminal history of convictions in Tippecanoe County includes fraud on a financial institution in 2000, theft in 2000, possession of marijuana in 2009, and strangulation and domestic battery in 2008. [Father J.S.] testified that he has been in jail for the majority of the last eleven (11) years and has not seen his other child in two and a half (2 ½) years.

[Father J.S.] has not had meaningful contact with N.S. and M.S. He did not know their birthdays. He acknowledged that he had minimal contact with M.S. According to [Father J.S.], he was with N.S. "a lot' during the first year of his life.

[Father J.S.] hopes to be licensed to tattoo in Indiana. He would like to finish an associate degree and he has carpentry and electrical skills. [Father J.S.] participated in two (2) anger management programs and animal rehabilitation at the Indiana Department of Correction.

17

(Mother's App. 15-16).

Father J.S. argues that the trial court should have waited for him to be released from jail and to attempt reconciliation before terminating his parent rights. Given Father J.S.'s history as stated by the trial court and the evidence in the record, we cannot conclude that such a wait would have resulted in the remedy of the conditions which resulted in the continuing placement outside his presence.

   *b.*     *Best interests*

Father J.S. contends that termination is not in the best interests of the children. Like Father D.F., Father J.S. cites *In re G.Y* in support of his contention. Father J.S. emphasizes that at the time of the termination hearing his release from jail was imminent and that he was employable and could have provided a stable home for the children.

Father J.S. acknowledges that upon his release from incarceration, he will live with his mother in a house that is not big enough for the children. Father has an unquestioned history of drug abuse, criminal conduct, and prior termination of parental rights. Furthermore, even though he has some skills that may lead to employment, there is no guarantee that he will complete the requirements to turn these skills into a source of steady income. Unlike the mother in *G.Y.*, Father J.S. has failed to show that waiting for him to stabilize his life is in the best interests of the children.

<u>CONCLUSION</u>

We conclude there was clear and convincing evidence to support the trial court's decision to terminate Mother's parental rights to J.L.S., M.S., and N.S. We also conclude that there was clear and convincing evidence to support the trial court's decision to terminate Father D.F.'s parental rights to J.L.S. and Father J.S.'s parental rights to M.S. and N.S. We will reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We find no such error here and, therefore, affirm the trial court.

Affirmed.

NAJAM, J., and RILEY, J., concur.